In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1116

JIMIA STOKES,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF CORRECTIONS,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:21-cv-01075 — **Jonathan E. Hawley**, *Judge.*

SUBMITTED APRIL 14, 2026 — DECIDED JULY 31, 2026

Before HAMILTON, KIRSCH, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Jimia Stokes worked for Wexford
Health Services, Inc., a contractor that staffed Illinois state
prisons with mental-health professionals. Her position was at
Pontiac Correctional Center in Pontiac, Illinois. She resigned
after she was repeatedly confronted at work for wearing al-
legedly inappropriate clothing. After she resigned, she sued
Wexford and the Illinois Department of Corrections, alleging
they violated Title VII of Civi the l Rights Act of 1964 by

discriminating against her based on her race and sex. She dismissed her claims against Wexford, so those are not before us. But she appeals the district court's order granting summary judgment to the department. The court concluded these claims fail because, under our five-factor test in *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377 (7th Cir. 1991), the department was not her joint employer and thus not liable to her under Title VII. We agree and thus affirm.[1]

## I. Background

We recount the facts in the light most favorable to Stokes, and draw all reasonable inferences in her favor, because she opposes summary judgment. *Taylor v. Schwarzhuber*, 132 F.4th 480, 486 (7th Cir. 2025).

### A. Factual Background

The department contracted with Wexford to provide mental-health services at its facilities, including Pontiac, a prison for men. Wexford, the "vendor," served as an independent contractor, not an agent or employee of the department. As part of its duties Wexford was responsible for hiring individual employees to staff Pontiac's medical units, subject to the department's approval. Wexford also transferred employees among state facilities as needed.

In 2017 Stokes applied through and interviewed with Wexford for a mental-healthcare position at Pontiac. An employee from Wexford coordinated her interview and

---

[1] We decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. Fed. R. App. P. 34(a)(2)(C).

instructed her to fill out forms for both Wexford and the department. Wexford then hired Stokes.

After she was hired, Stokes received Wexford's policies and new-employee manual, and she completed new-hire training with Wexford, which included some clinical training. She did not receive Pontiac's policies or participate in training there. Pontiac provided her a radio and keys, though it sometimes provided personnel computers or desks, too. Wexford was responsible for providing medical personnel like Stokes pagers so they could be contacted while off site.

One Wexford policy Stokes received when she was hired governed personal appearance. This policy explained that Pontiac had "the authority to define appropriate standards for personal appearance" for those "contractor[s] operating in" Pontiac. Wexford's policy required its employees to comply with Pontiac's "standards of personal appearance." If a Wexford employee did not comply, the employee must leave Pontiac to "change attire … and then return to work."

Pontiac, in turn, treated dress as a security matter, because inappropriate dress might subject personnel to additional attention, heckling, or even assault. Thus, everyone working in the prison was told to "dress professionally in attire that is … appropriate for their respective assignments."

Stokes began working at Pontiac in February 2018. Wexford controlled most all her work. All her paychecks came from Wexford. And Wexford set and managed her day-to-day schedule. She worked with a Wexford staff coordinator to choose her shifts, and each day Wexford gave her a list of inmates to care for. Wexford's mental-health-services director managed Stokes directly. The director was himself supervised

by another Wexford employee. Further, the lines of authority were clear: Wexford controlled Wexford staff. Stokes's supervisors testified that they disciplined only Wexford staff at Pontiac. And Pontiac personnel testified they did not discipline Wexford staff at Pontiac.

Problems with Stokes's clothing began in May 2018, when her supervisor claimed he could see impressions of her nipples through her shirt. A lieutenant at Pontiac lodged an identical complaint in July. A shift supervisor, a major at Pontiac, agreed and told Stokes to go home, change, and return to work. Pontiac later investigated this July incident by interviewing (among others) Stokes, her supervisor, the lieutenant, and the major. The ensuing report concluded that Stokes had violated Pontiac's code of conduct by failing to follow the lieutenant's directions on her attire, though the report imposed no discipline on Stokes.

A few days after the July incident, the same lieutenant and major confronted Stokes about a report that her clothing showed her underwear. Stokes demonstrated her underwear was not showing by lifting her shirt and turning around. Similarly, an assistant warden confronted Stokes about a report that she had worn a shirt that showed her midriff. And her supervisor called her into her office to address a report that she had worn leggings to work.

Stokes lodged complaints about these and other incidents. And she alleged Pontiac retaliated against her in response to these complaints. For example, she claimed a prison guard trapped her in an interstitial hallway—a hallway between doors that a guard must unlock for one to pass through—because she had complained about another guard.

Stokes was not disciplined or fired for her alleged misconduct. Rather, in November 2018, she resigned.

### B. Procedural Background

Stokes sued Wexford and the department. Relevant here, she alleged they violated Title VII by discriminating against her based on her race and sex, subjecting her to a hostile work environment resulting in her constructive discharge, and retaliating against her.

The department moved for summary judgment. It argued (among other things) that it was not liable to Stokes because it did not jointly employ her with Wexford. The district court agreed and entered summary judgment for the department. Stokes then voluntarily dismissed Wexford and appealed the court's order granting summary judgment to the department.

## II. Discussion

We conclude the district court correctly granted summary judgment to the department. But before we get to summary judgment, we must assure ourselves that our appellate jurisdiction is secure. *Minnesota Life Insurance Co. v. Kagan*, 724 F.3d 843, 846 (7th Cir. 2013).

### A. Appellate Jurisdiction

Stokes appealed through 28 U.S.C. § 1291, which gives us appellate jurisdiction over "final decisions of the district courts." A decision is final if it "ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment." *West v. Louisville Gas & Electric Co.*, 920 F.3d 499, 503 (7th Cir. 2019). To make clear when a judgment is final and thus appealable, Rule 58 direct district courts to enter "[e]very judgment" in a "separate document." Fed. R. Civ. P.

58(a). Here the district court did not do so, and the parties never asked it to.

But this omission "is not fatal to our jurisdiction" if the court "has otherwise indicated its intent to finally dispose of all claims." *Wisconsin Central Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 854 (7th Cir. 2018). We are satisfied the district court did so here. The court entered judgment for the department in a text order, which disposed of all those claims. When it dismissed Wexford in another text order, it "terminated" the action and denied all other motions as "moot." These orders show the court was finished with the case when Stokes appealed. On to the merits.[2]

### B. Summary Judgment

We review the grant of summary judgment *de novo*. *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023). We thus "need not scrutinize the district court's reasoning." *Harris v. Bellin Memorial Hospital*, 13 F.3d 1082, 1086 n.4 (7th Cir. 1994). Rather, we examine the record anew, in the light most favorable to Stokes, and draw all reasonable inferences in her favor. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). That said, she must identify specific evidence to defeat summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). Summary judgment is proper "where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[2] The department does not argue Stokes's appeal was untimely under Fed. R. App. P. 4(a), so we do not consider timeliness. *Vergara v. City of Chicago*, 939 F.3d 882, 885 (7th Cir. 2019) (this deadline is a mandatory claims-processing rule that may be forfeited).

Title VII says an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" (relevant here) "such individual's race, color," or "sex." 42 U.S.C. § 2000e–2(a)(1). Everyone agrees that the department is an "employer" as generally defined by Title VII. *See* 42 U.S.C. § 2000e(b); *Bronson v. Ann & Robert H. Lurie Children's Hospital of Chicago*, 69 F.4th 437, 448 (7th Cir. 2023) ("Only an employer can be liable under Title VII."). But the question for us is whether the department was *Stokes's* employer. If not, she cannot bring her claims. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015).

A plaintiff may have multiple Title VII "employers." *Id.* And whether the department is one of them—whether it jointly employed her with Wexford—is a question of law. *Bronson*, 69 F.4th at 449. We use a five-factor test to determine whether a defendant employed a plaintiff for Title VII purposes. The point of these factors is to discern whether a plaintiff was in fact a defendant's employee or merely an independent contractor. *Id*. The factors are:

> (1) the extent of the purported employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) the responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) the method and form of

payment and benefits, and (5) the length of job commitment and/or expectations.

*Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017) (quoting *Knight*, 950 F.2d at 378–79) (cleaned up). The first factor—control—is the most important. *Johnson v. Advocate Health & Hospital Corp.*, 892 F.3d 887, 905 (7th Cir. 2018).

Considering each factor in turn, minus the fifth factor because no party argues it, the undisputed facts show the department did not jointly employ Stokes.

**Control.** In considering how Stokes was controlled and supervised, we focus on who set her schedule, directed how she performed her work, and disciplined her. *Nischan*, 865 F.3d at 929; *Bronson*, 69 F.4th at 449. We also consider those "key powers" of "hiring and firing." *Love*, 779 F.3d at 703 (citation omitted).

Wexford, not the department, controlled Stokes and how she performed her work. Wexford interviewed and hired her, subject to the department's approval. Wexford set her schedule based on the department's needs and told her whom to treat. Stokes reported to a Wexford employee, who himself reported to a Wexford employee, and only Wexford personnel disciplined her. Had Stokes wanted to transfer to another site, she would have done so through Wexford. And Stokes resigned by emailing a Wexford employee.

To be sure, the department completely controlled the premises where Stokes worked. But this does not show it controlled Stokes "with respect to her work as" a mental-health professional, which is what matters here. *Bronson*, 69 F.4th at 449. Indeed, the record suggests the exact opposite: that Wexford controlled her day-to-day.

Nor does our conclusion change because the department controlled some of *Wexford's* actions. The department could veto a proposed hire and its needs drove the shifts Wexford staffed with personnel. But this shows the department had control over "the conduct of another contracting party"—here, Wexford—not that it controlled Stokes. *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002) (cleaned up). These terms reflect "nothing more than" the department's agreement with Wexford, not "the discretionary control an employer daily exercises over its employees' conduct." *Id.* (cleaned up). Indeed, "it is very common for service providers to adhere to their client's wishes on personnel decisions." *Nischan*, 865 F.3d at 929. Just because a service provider does so does not render such personnel a client's employee. *Id.*

Stokes next argues the department exercised control over her through its dress policy, which Wexford required that she follow. But the department controlled what everyone wears—employees, contractors, prisoners, and visitors—because dress in a prison is a security matter. Such control "with respect to prison security and safety" does not tell us much about controlling employees specifically. *See American Federation of State, County & Municipal Employers, Council 31 v. State Labor Relations Board*, 216 Ill. 2d 569, 588 (2005).

Stokes also insists the department could discipline (and so control) her. But the record squarely contradicts this claim. The department's employees testified that they disciplined department staff, not Wexford's; and Wexford supervisors testified that they disciplined Wexford staff, not the department's. Stokes says the department must have been able to discipline her because it investigated the July incident. True, the department investigated and concluded Stokes violated

its policies. But its report did not impose punishment; it merely substantiated a claim against her. Indeed, Stokes testified she did not even know about the report until this litigation and was not punished for its findings.

In sum, this "most important" factor suggests Wexford, not the department, employed Stokes. *Johnson*, 892 F.3d at 905.

**Skills.** Next, we consider whether the department provided Stokes the skills and training she needed to work as a mental-health professional. *Nischan*, 895 F.3d at 929. It did not.

Stokes obtained her primary credentials—a master's degree and counseling license—before applying to Wexford or working at Pontiac. And there is no evidence the department gave her additional mental-healthcare training. Indeed, she testified in her deposition that, although she recalled receiving general workplace and clinical training from Wexford, she did not recall receiving any training from the department.

Even if the department trained her to work in a prison setting, such training would not show the department "was in any respect responsible for her training or certification" as a mental-health professional. *Bronson*, 69 F.4th at 450. Providing "training and credentials" that facilitate "access to" a premises and "compliance with" its protocols is not providing training for one's "substantiative work." *Id.*

With no evidence that the department provided Stokes skills or training required to work as a mental-health professional, this factor suggests it did not jointly employ her.

**Supplies.** We must also consider whether the department bore "responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations." *Knight*, 950 F.2d at 378–79 (citation omitted). This

includes whether it provided Stokes "with the tools and equipment necessary to perform her job." *Nischan*, 865 F.3d at 930. Though this factor is a closer call, we conclude it too suggests the department did not employ Stokes.

The department maintained the premises where Stokes worked, Pontiac, and provided her keys and a radio. But as explained above, maintaining Pontiac is not enough to show the department employed Stokes. *See Bronson*, 69 F.4th at 449–50. And merely incurring ancillary costs in "hosting" Stokes—like "supplying pagers, access badges, email accounts and the like"—is not the same as footing "the primary costs of" employing her. *Id.* at 451. If anything, these facts confirm that Stokes worked on-site as an independent contractor, not as an employee. *See Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 493 (7th Cir. 1996) (anesthesiologist not an employee of a hospital even though he treated patients there and "did not supply his own equipment or assistants").

Given the department merely provided Stokes with supplies one would expect for an independent contractor, this factor suggests it did not employ her.

**Pay.** Last, we consider who paid Stokes. *Nischan*, 865 F.3d at 929. That was Wexford. This too suggests the department did not employ her. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 362 (7th Cir. 2016).

\*         \*         \*

In sum, the four *Knight* factors at issue here point to one conclusion: the department did not jointly employ Stokes. To be sure, a different record might compel or permit a different

conclusion. But on these facts, we hold that the department is not liable to Stokes under Title VII.

### III. Conclusion

We AFFIRM the district court's order granting summary judgment to the department.